FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 JAN 27   AM 7: 33

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MICHAEL WASHINGTON** | **CIVIL ACTION** |
| **VERSUS** | **NO. 04-2265** |
| **N. BURL CAIN, WARDEN** | **SECTION "S"(6)** |

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. §636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. §2254(e)(2). Accordingly, it is hereby recommended that the petition of Michael Washington for habeas corpus relief be **DENIED WITH PREJUDICE.**

____ Fee_____
____ Process_____
**X** Dktd_____
____ CtRmDep_____
____ Doc. No _____

# I.  PROCEDURAL HISTORY

Petitioner, Michael Washington, is a state prisoner currently incarcerated in the Louisiana State Penitentiary, Angola, Louisiana.  In March, 1994, petitioner was charged by bill of information with manslaughter in violation of LSA-R.S. 14:31.[1]  On January 11, 1995, following trial by jury, petitioner was found to be guilty as charged.[2]  On July 17, 1995, following a hearing, petitioner was adjudicated to be a fourth-felony offender and sentenced to life imprisonment.[3]  Pursuant to petitioner's appeal, the Louisiana First Circuit Court of Appeal, on September 27, 1996, vacated petitioner's habitual offender adjudication and sentence due to the trial court's failure to rule on petitioner's motion for a new trial and motion for post verdict judgment of acquittal prior to sentencing him.[4]

Following the Louisiana First Circuit's remand, the trial court, on December 30, 1996, again adjudicated petitioner to be a fourth-felony offender and sentenced him to

---

[1] A copy of the pertinent bill of information is contained in the State rec., vol. 1 of 3.

[2] *See* State rec., vol. 2 of 3, p. 405, lines 25-27.

[3] *See* State rec., vol. 2 of 3, p. 441, lines 5-8 and p. 442, lines 23-27.

[4] La. Code Crim. P. art. 821A provides, in pertinent part, that a "motion for a post verdict judgment of acquittal must be ... disposed of before sentence." La. Code Crim. P. art. 853 provides, in pertinent part, that a "motion for a new trial must be ... disposed of before sentence."  A copy of the Louisiana First Circuit's September 27, 1996 unpublished opinion, *State v. Washington*, No. 95 KA 2589, is contained in the State rec., vol. 3 of 3, pp. 502-504.

life imprisonment.[5]  However, in connection with petitioner's appeal, the Louisiana First Circuit, on October 17, 1997, once again vacated petitioner's habitual offender adjudication and sentence and remanded the matter due to the fact that the trial court had still failed to rule on petitioner's pending motion for a post verdict judgment of acquittal.[6]

In accordance with the state appellate court's remand, the trial court, on January 14, 1998, denied petitioner's motion for a post judgment verdict of acquittal. Approximately three months later, on April 22, 1998, the trial court conducted a hearing following which petitioner was again adjudicated to be a fourth-felony offender and was again sentenced to life imprisonment.[7]  Thereafter, petitioner filed two appeals, one, *State v. Washington*, 99 KA 2695, challenging his conviction and the other, *State v. Washington*, 99 KA 2696, challenging his sentence.  On September 22, 2000, the Louisiana First Circuit Court of Appeal, in both of its opinions, 99 KA 2695 and 99 KA 2696, affirmed petitioner's conviction and sentence.[8]  Approximately one year later, on October 26, 2001, petitioner's

---

[5]The above information was attained from p. 2 of the Louisiana First Circuit's September 22, 2000 unpublished opinions, *State v. Washington*, 99 KA 2695 and *State v. Washington*, 99 KA 2696, copies of which are attached to petitioner's federal habeas corpus application.

[6]A copy of the Louisiana First Circuit's October 17, 1997 unpublished opinion, *State v. Washington*, No. 97 KA 0452, is contained in the State rec., vol. 3 of 3, p. 508.

[7]The above information was attained from p. 2 of the Louisiana First Circuit's September 22, 2000 unpublished opinions, *State v. Washington*, 99 KA 2695 and *State v. Washington*, 99 KA 2696, copies of which are attached to petitioner's federal habeas corpus application.

[8]As noted earlier, copies of both of these state appellate court decisions are attached to petitioner's federal habeas corpus application.

writ application to the Louisiana Supreme Court was denied. *State v. Washington*, 799 So.2d 1148 (La. 2001).

Following the completion of his direct appeal proceedings, petitioner sought post-conviction relief. Petitioner's efforts in this regard culminated on June 18, 2004, when the Louisiana Supreme Court denied his writ application. *State ex rel. Washington v. State*, 876 So.2d 795 (La. 2004).

In the instant application for federal habeas corpus relief, petitioner argues that his trial counsel was ineffective due to her failure to file a discovery motion, failure to discover and introduce the victim's arrest and conviction history, failure to object and preserve assignments of error for appeal, failure to object to the qualification of two witnesses as experts, failure to ask the necessary questions to expose the prejudice which jeopardized petitioner's right to a fair and impartial jury, failure to obtain funds for the purpose of hiring an expert and for having an autopsy performed, and failure to acknowledge a conflict of interest which adversely affected counsel's trial strategy and actual performance. Petitioner further claims that his life sentence is unconstitutionally excessive, that the trial court erred in allowing Dr. John Otten to offer expert testimony and in allowing the prosecution to improperly exclude prospective black jurors during voir dire, that he was denied his constitutional right to a "full voir dire examination", and that he was denied his constitutional right "to a speedy and public trial by an impartial jury". The State does not

challenge the fact that petitioner has exhausted his state court remedies as required under *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982), and that the instant petition is timely.

## II. STATEMENT OF FACT[9]

On December 23, 1993, Willie James Crosby, the victim of the instant offense, was in the Big Boy's Convenience Store in Franklinton, Louisiana, when the defendant entered the store. The defendant spoke to the victim, asking him where his (the victim's) gun was. The store clerk, at that point, told both the defendant and the victim to leave if there was going to be trouble. Accordingly, the victim headed toward the store entrance, followed closely by the defendant. A scuffle broke out, and the victim fell or was pushed to the ground and the defendant got on top of him. The defendant then started beating the victim in the face, hitting him approximately 15 to 20 times. The victim, a 64-year old man, did not attempt to hit the defendant.

After the defendant had finished beating the victim, he stood up and, according to one witness, kicked the victim in the head before walking away from the scene. When the police arrived, they found the victim lying on the ground, bleeding profusely. An ambulance was called and the victim was transported to Riverside Medical

---

[9]The statement of fact is taken from the Louisiana First Circuit's unpublished opinion, *State v. Washington*, 99 KA 2695, a copy of which is attached to petitioner's federal habeas corpus application.

Center where he was found to have numerous severe facial fractures and damage to his eyes. After he was stabilized, the victim was transported to Charity Hospital where he underwent a number of surgical procedures to correct the damage to his face and eyes.

The victim remained at Charity Hospital until January 19, 1994, at which point, he was deemed to be stable and was transported to St. Ann's Nursing Home. The victim remained at St. Ann's until January 28, 1994. On that date, the victim was transported to the emergency room of Delaron Hospital in Chalmette, Louisiana, where he died.

Dr. Rodney Huddleston, the physician in charge of residents at St. Ann's Nursing Home, signed the victim's death certificate, representing that the victim died from natural causes. However, at trial, Dr. Huddleston admitted that he never saw or examined the victim prior to his death. Upon learning the victim's history, Huddleston acknowledged that he was in error with respect to his representation, on the death certificate, that the victim had died from natural causes. Huddleston's conclusion in this regard was supported by the testimony of other physicians who had treated the victim or had reviewed his medical history. These physicians all concluded that the beating which the victim endured at the hands of defendant contributed to and/or hastened his death.

## III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a comprehensive overhaul of federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law where there has been an adjudication on the merits in State court proceedings.

State court determinations of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference unless they were "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."  *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  The United States Supreme Court has advised that:

> Under the "contrary to" clause, a federal habeas corpus court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 1056, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); *Hill*, 210 F.3d at 485.  Questions of fact found by the state court are "presumed to be correct ... and we will give deference to the state court's decision unless it `was based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hill*, 210 F.3d at 485, *quoting* 28 U.S.C.§ 2254(d)(2).

## IV. ANALYSIS

### A. Excessive Sentence/Insufficient Evidence[10]

Petitioner argues that the life sentence imposed by the state trial court was "excessively severe and disproportionate to the crime and the offender".[11] In support of this argument, petitioner cites only state law. However, even if one assumes that the sentence was, in fact, violative of state law, absent a constitutional violation, petitioner is not entitled to federal habeas corpus relief. *See generally Vardas v. Estelle*, 715 F.2d 206, 208 (5th Cir. 1983), *cert. denied*, 465 U.S. 1104, 104 S.Ct. 1603, 80 L.Ed.2d 133 (1984).

---

[10]While petitioner has labeled the instant claim as, "Excessive Sentence", a reading of his supporting arguments reflects that in addition to contending that his life sentence is excessive, he is also claiming that there was insufficient evidence to support his manslaughter conviction. *See* Federal rec., doc. 1, petitioner's "Memorandum in Support of Application for Post Conviction Relief" at pp. 19-20. It is for this reason that the court has modified the labeling of the instant claim.

[11] *See* petitioner's memorandum at p. 19. Petitioner raised the instant claim in the state court system pursuant to his direct appeal. The Louisiana First Circuit Court of Appeal, rather than addressing the merits, disposed of petitioner's excessive sentence claim based upon a state procedural bar, determining that the court was "precluded from reviewing this assignment of error" due to petitioner's failure to file a motion for reconsideration of his sentence as required under LSA-C.Cr.P. art. 881.1. (*See State v. Washington*, 99 KA 2696 at p. 3, a copy of which is attached to petitioner's federal habeas corpus petition.) This court, however, is not precluded, on habeas review, from addressing the merits since a defendant's failure to comply with LSA-C.Cr.P. art. 881.1 does not preclude review of a defendant's sentence for unconstitutional excessiveness. *See State v. Schieffler*, 841 So.2d 1000, 1002 (La. App. 4 Cir.), *writ. denied*, 853 So.2d 636 (La. 2003).

As for petitioner's life sentence being unconstitutional, the Supreme Court has specifically rejected the principle that the Eighth Amendment contains a proportionality guarantee. *Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991).[12] If a sentence is within the statutory limits, a federal habeas court will not upset the terms of that sentence unless it is so disproportionate to the offense as to be completely arbitrary and shocking. *Bonner v. Henderson*, 517 F.2d 135, 136 (5th Cir. 1975); *see also Smallwood v. Johnson*, 73 F.3d 1343, 1347 (5th Cir. 1996) (emphasizing that a federal court will not review a state sentencing without a threshold showing that the sentence is "grossly disproportionate to the offense.")  In the instant matter, petitioner's life sentence as a fourth-offender is in accordance with the state statutory limits. *See* LSA-R.S. 15:529.1.A.(1)(c). This fact, coupled with petitioner's long criminal history, leads this court to conclude that petitioner's life sentence is not excessive.[13]

---

[12] In *Harmelin*, 501 U.S. at 962, 111 S.Ct. at 2684, quoting *Rummel v. Estelle*, 445 U.S. 263, 274, 100 S.Ct. 1133, 1139, 63 L.Ed.2d 382 (1980), the Supreme Court reaffirmed that "'for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of the sentence actually imposed is purely a matter of legislative prerogative.'"

[13] During petitioner's July 17, 1995 sentencing, the trial court specifically noted petitioner's long criminal history dating back to 1980.  The court observed:

> Mr. Washington has never been able to stay out of trouble once he is outside the custody of either the sheriff or the Department of Public Safety and Corrections. It's obvious to me that Mr. Washington cannot respect the rights of other people. He cannot respect their property. He cannot respect their person.

Petitioner also argues that his life sentence was excessive in light of the fact that "the State never prove[d] [he] was responsible directly or indirectly for the death of [the victim] Willie James Crosby."[14]  In support of this argument, petitioner states that he and the victim had a "fist fight" and there was no evidence reflecting that he intended that his action in fighting with the victim would cause his death.  Further, petitioner points to the fact that no autopsy was performed to determine the cause of the victim's death and that the victim's death certificate reflects that he "died of natural causes, i.e., a heart attack."[15]

Under LSA-R.S. 14:31A(2), the crime of manslaughter is defined as:  "A homicide committed, **without any intent** to cause death or great bodily harm [emphasis added]."  Accordingly, petitioner's argument that there was insufficient evidence to support his manslaughter conviction because there was no evidence reflecting that he intended to cause the victim's death, is without merit.

Further, as the Louisiana First Circuit noted, it was established at trial that the victim's life, following the beating, took a definite turn for the worst:

---

*See* State rec., vol. 2 of 3, p. 442, lines 16-23.

[14]*See* petitioner's memorandum at pp. 19-20.

[15]*See* petitioner's memorandum at p. 20.

> The victim's son testified that prior to being beaten by the defendant, his father had lived alone, driven a car, and cared for himself. After being admitted to the hospital, the victim underwent several surgical procedures, became unable to feed himself, and was not coherent or able to care for himself. As a result, he was placed in a nursing facility on January 20, 1994, and died eight days later.[16]

Additionally, all of the medical personnel questioned with regard to the cause of the victim's death concluded that the beating he suffered at the hands of petitioner contributed to and/or hastened his death. As the state appellate court noted, Dr. John Otten, who treated the victim at Charity Hospital, opined that "the beating the victim received contributed directly to, and hastened, his death." Dr. Richard Tracy stated that although the victim suffered from pre-existing conditions that "could be life threatening, the circumstances and series of events leading to the victim's death left no doubt that the injuries from the beating hastened the victim's death."[17]

In determining, upon habeas corpus review, the merits of petitioner's insufficient evidence claim, the issue to be resolved is whether, viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found, beyond a reasonable doubt, that petitioner was guilty of manslaughter. *See Jackson v. Virginia*, 443

---

[16]*See State v. Washington*, 99 KA 2695 at p. 5. A copy of the unpublished opinion is attached to petitioner's federal habeas corpus application.

[17]*See* the Louisiana First Circuit's unpublished opinion, *State v. Washington*, 99 KA 2695, at pp. 5-6, a copy of which is attached to petitioner's federal habeas corpus application.

U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  Based upon the above, the court finds

that this issue must be resolved in the positive.  Accordingly, the instant claim, that

petitioner should not have received a life sentence because he was not properly found

guilty of manslaughter, is without merit.

### B.  Court Erred in Allowing Dr. John Otten Testify as an Expert Witness

Dr. John Otten, the chief resident of oral maxilla facial surgery for LSU

Medical Center, operated on the victim on two occasions following his transfer to Charity

Hospital as a result of the injuries he sustained following his beating at the hands of

petitioner.  Petitioner does not object to Dr. Otten's testimony regarding the two surgical

procedures he performed on the victim.[18]  Petitioner, however, contends that Dr. Otten

should not have been allowed to offer testimony regarding his opinion "that the beating

[the victim] received contributed directly to [his] death" and "hastened his death."[19]   The

basis of petitioner's objection is the fact that Dr. Otten, at the time he offered his opinion

at trial, was not "board certified" in oral maxilla facial surgery.

Dr. Otten, on direct examination, offered the following testimony with

respect to his credentials.

---

[18]*See* Federal rec., doc. 1, petitioner's supporting memorandum at pp. 21-22.

[19]*See* Federal rec., doc. 1, petitioner's supporting memorandum at p. 22.

Q. Please state your name and your occupation.

A. John Otten. I'm currently chief resident of oral maxilla facial surgery for LSU Medical Center.

Q. What is your educational background, Doctor?

A. I'm both a dentist and physician, and currently I'm finishing my final year of training in oral maxilla facial surgery.

Q. Where did you receive your dental degree and when?

A. University of Nebraska Medical Center in May of 1989.

Q. Are you a licensed dentist?

A. Yes, sir.

Q. And when did you receive your medical degree?

A. In May of 1992 from LSU Medical Center.

Q. Are you a licensed physician?

A. Yes, sir.

Q. And you stated you were in your final year of residency. If you could, just describe to the jury what we mean by these terms?

A. Following dental school to become an oral maxilla facial surgeon you need to complete six years of training which includes completion of medical school before you're an oral maxilla facial surgeon or able to practice as such.

Q. So you're in your five years after – you have had five years and you're in your last year of your residency for that?

A. Yes, sir. Five and a half years.[20]

Based upon the above, the State offered Dr. Otten as an expert in the fields of general medicine and oral surgery. Defense counsel, however, questioned Dr. Otten's expertise.

---

[20]*See* State rec., vol. 1 of 3, p. 218, lines 27-32, and p. 219, lines 1-20.

> Q. Dr. Otten, my name is Patricia Fox and I represent Mr. Washington. I believe that you testified that you were in your final year of residency; is that right?
>
> A. Correct.
>
> Q. So you won't be eligible to take your board certification exams until after you finish your residency; is that the way it works?
>
> A. Yes, ma'am.
>
> Q. So right now you are not board certified, is that fair to say? Is that accurate?
>
> A. That's correct.[21]

Based upon the above, defense counsel argued that Dr. Otten was "not an expert because he [was] not board certified". Counsel explained: "I have no objection to his testimony as to facts that he knows ... and any treatment that he might have given the victim, but I would strongly object to Dr. Otten being considered an expert."[22] The trial court, however, overruled defense counsel's objection.

Set forth below is the trial testimony offered by Dr. Otten to which petitioner has no objection.

> Q. What procedures were conducted as to Mr. Crosby?
>
> A. Prior to January 1994, he had two surgery procedures performed. He was originally seen in the emergency room on December 23rd, 1993 for multiple facial fractures and head injuries at which time he was taken to the operating room on the 24th of December to stop any bleeding, what we call

---

[21]*See* State rec., vol. 1 of 3, p. 220, lines 2-12.

[22]*See* State rec., vol. 1 of 3, p. 220, lines 14-21.

nasal packings, to stop bleeding from the fractures of the face. Then he was also taken back to the operating room on the 29th of December for final treatment of his facial fractures which included incisions, looking at the fractures and fixation of the fractures in their proper position, replaced the bones where they needed to be.

Q. What specific fractures were involved?

A. He had what we call a Le Fort tree type injury which is a disjunction of the facial bones from the base of the skull essentially separating the facial structures from the skull itself.

Q. Was there one fracture or were there multiple fractures?

A. It was what we call comminuted which means it was in multiple pieces, fragmented.

Q. Yes, sir. And after these procedures, what happened next in his treatment of any remarkable nature?

A. Well, during his stay at Charity Hospital he never regained full consciousness. He was awake, but was unable to really – he was [dis]oriented, unable to state his name, and he also had some damage to the left eye from the trauma which resulted in a further surgical procedure on the 10th of January where the lens and liquid fluid of the eye itself were removed, and due to his inability to eat or drink from his poor mental status, he had a feeding tube placed in his stomach just prior to his discharge.

Q. What was the purpose of that tube?

A. When somebody's level of consciousness is such that they are unable to prevent swallowing and aspirating fluid or having whatever they eat or drink go into the lungs, we place a tube into the stomach so they can be fed directly through the stomach.

Q. These injuries that you see noted and that you saw, are they consistent with trauma from a beating?

A. Yes, sir.

Q. What was his condition upon discharge?

15

A. His condition upon discharge was what we would describe as stable, which means he – you did not expect any changes in vital signs. He would be able to be managed outside the hospital environment.[23]

Following the above testimony, the State questioned Dr. Otten regarding what transpired, in terms of the victim's condition, following his release from Charity Hospital. It is this testimony to which petitioner objects.

Q. Now, the condition that he was in upon discharge, would you have been surprised or were you surprised in knowing that he died some eight or nine days later?

A. Not surprised. From the severity of his head injury and facial injuries, not surprised.

**Q. Now, I want you to assume for the purposes of this question the following: First, assume that before and on December the 22nd of 1993 this patient was walking around normally, communicating normally, shopping and doing the other regular activities of life; secondly, that the patient received the injuries that you, among other physicians, treated as a result of a beating on December the 22nd of 1993; and, third, that the patient after his discharge from your institution on January the 19th of 1994, went to St. Ann's Nursing Home, and then on January the 28th, 1994 was in cardiac arrest and brought to Delaron Hospital where he died. Assuming those facts for the purpose of this question, do you have an opinion as to whether the beating and injuries contributed directly to the patient's death?**

**A. Yes, I would assume that they would contribute directly to his death, the beating.**

**Q. Is that in fact your opinion?**

**A. Yes, sir.**

---

[23]*See* State rec., vol. 1 of 3, p. 221, lines 21-32; p. 222; and, p. 223, lines 1-3.

**Q. Then taking those same assumptions, would it be your opinion that the beating and injuries hastened the death of the patient?**

**A. Yes, sir.**

**Q. That's your definite opinion also?**

**A. Yes, sir, my definite opinion.**[24]

Federal habeas corpus review is limited to questions of constitutional dimensions, and federal courts generally do not review evidentiary issues under state law. *Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992), *cert. denied*, 502 U.S. 1113, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993). Such review is proper only to determine whether a state trial judge's error is so extreme "as to render the trial fundamentally unfair or violate an explicit constitutional right." *Peters v. Whitley*, 942 F.2d 937, 940 (5th Cir. 1991), *cert. denied*, 502 U.S. 1113, 112 S.Ct. 1220, 117 L.Ed.2d 457 (1992). To constitute a denial of fundamental fairness, the evidence erroneously admitted at trial must be material in the sense of a crucial, critical, highly significant factor. *Nettles v. Wainwright*, 677 F.2d 410, 415 (5th Cir. Unit B 1981); *Hills v. Henderson*, 529 F.2d 397, 401 (5th Cir.), *cert. denied*, 429 U.S. 850, 97 S.Ct. 139, 50 L.Ed.2d 124 (1976).

In the instant matter, the objectionable testimony, rather than constituting material evidence, was merely cumulative. Dr. Otten's opinion regarding what

---

[24]*See* State rec., vol. 1 of 3, p. 223, lines 4-32; p. 224, line 1 (emphasis added).

contributed to and/or hastened the victim's death was in accord with the opinion of two other medical experts.

Dr. Lee Robert Domangue, a board certified emergency room physician since 1982 whose expertise the defense did not challenge, examined the victim when he was transferred, via ambulance, from St. Ann's Nursing Home to Delaron Hospital.[25] Dr. Domangue testified that shortly after Mr. Crosby's arrival at the hospital, "his heart rate stopped" and "advance cardiac life support" was provided for approximately 20 minutes. Thereafter, unable to recesitate the victim, he was pronounced dead.[26] Regarding the cause of the victim's death, Dr. Domangue offered the following testimony.

> **Q.  [F]or the purposes of this question I want you to assume some facts. Okay?  Doctor, I want you to assume that before and in fact on December 22nd of 1993 this patient, Willie Crosby, was walking around normally, communicating normally, doing his own shopping, taking care of himself, doing other regular activities of life.  Okay? That the patient received the injuries as a result of a beating on December 22nd of 1993.  He was immediately brought to Riverside Medical Center in Franklinton and on the 23rd of December of 1993 was then transferred to big Charity Hospital.  He remained there and was discharged to St. Ann's Nursing Home on January 19th of 1994 and then on the 28th, nine days later, he was brought in the condition that you saw him into Delaron Hospital and he died as you have testified.  Using those assumptions, do you have an opinion as to whether the beating and the injuries contributed to the patient's death?**
>
> **A.  I would say they did.**

---

[25]*See* State rec., vol. 2 of 3, p. 287, lines 24-32; p. 288, lines 1-24.

[26]*See* State rec., vol. 2 of 3, p. 289, lines 24-27.

**Q. Would you also have an opinion as to whether the beating and injuries hastened the death of the patient?**

**A. I would say they did also.[27]**

Similarly, Dr. Richard Tracy, a board certified pathologist whose credentials the defense did not challenge,[28] offered the following testimony.

Q. [W]ere you able to come to an opinion as to the legal cause of death of Mr. Willie J. Crosby

A. Yes.

Q. Specifically what was that opinion?

A. He died as a combination of natural poor health and serious injuries that he received just prior to death.

Q. What caused him not to be in very good health at the time?

A. The principal documented conditions that the medical record[s] reflect is a condition called blastomycosis. It's a body-wide infection, a fungus, and also poor circulation in the brain or what is commonly known as a stroke. He apparently had experienced several small strokes in the past.

Q. Now, the blastomycosis, is that generally life threatening?

A. Usually not. It will be life threatening in someone who is in poor health for whatever reason.

Q. Now, what specifically were you able to tell about the injuries themselves that he was treated for?

A. The injuries that were noted in all of the medical records and agree with each other were confined to the face. He had several crushing force injuries causing breaking of many of the bones of the face and injuries to both eyes. This did not include fracturing of the skull in the usual sense or any documented injury to the brain itself.

---

[27]See State rec., vol. 2 of 3, p. 290, lines 12-32 (emphasis added).

[28]See State rec., vol. 1 of 3, p. 205, lines 7-32; p. 206, lines 1-7.

Q. Now, if it weren't for the injuries involved, do you think that Mr. Willie J. Crosby would have died?

A. I think not.

Q. And do you have an opinion as to whether these injuries caused a hastening of his death?

A. I don't think there's any doubt that the injuries did cause hastening of his death.

Q. What opinion do you have as to whether at this point an autopsy, the usefulness of the autopsy, when you were asked to consult on this?

A. Well, this came up, of course, some days after the actual death and burial, so we're talking about exhuming a body after a burial. The chances of getting useful information from this would be pretty slim.

Q. Were you able to come to an opinion as you gave here today without [the] necessity of that?

A. This is based on the medical documentation and I don't see much room for doubt.

Q. And as to the hastening, no doubt whatsoever as to that?

A. None whatsoever, no.

Q. **Now, for the purpose of the next question I want you to assume, this will be a hypothetical question, I would ask that you would assume that on December 22nd of 1993 that Willie James Crosby was doing the things that normal[] people do, that he was shopping, communicating with people, doing the normal tasks of everyday life, and that subsequently he received the injuries that you saw documented in these various medical records and subsequently some thirty-seven days later died at Delaron Hospital. Do you have an opinion as to whether or not the beating contributed to the patient's death?**

A. **I think there is no doubt that the injuries did contribute.[29]**

---

[29]*See* State rec., vol. 1 of 3, p. 209, lines 5-32; p. 210; p. 211, lines 1-2 (emphasis added).

20

Based upon the above, the court finds that the admission of Dr. Otten's alleged objectionable testimony does not constitute a denial of fundamental fairness. Accordingly, petitioner is not entitled to habeas corpus relief.

### C. Denial of Constitutional Right to Full Voir Dire Examination and Trial by Impartial Jury

Petitioner complains that he was denied his right to a "full" voir dire examination and that the jury which was ultimately empaneled was not impartial. In support of his claim, petitioner points to the exclusion by the State of prospective juror Betty Edwards. The basis of the State's challenge for cause was: "She said that she couldn't, as a tenet of her religion, sit in judgment."[30] Defense counsel objected, stating: "I didn't think she even said what her religion was, Judge. I just think she said, well, she would have a hard time judging somebody."[31] Immediately thereafter, the court ruled, stating: "I am going to grant the motion."[32]

---

[30]*See* State rec., vol. 1 of 3, p. 126, lines 23-27.

[31]*See* State rec., vol. 1 of 3, p. 126, lines 29-32. A review of the voir dire transcript reflects that the actual response from venire member, Betty Edwards, was: **"I just don't think I could send anybody to prison."** *See* State rec., vol. 1 of 3, p. 101, lines 13-15 (emphasis added).

[32]*See* State rec., vol. 1 of 3, p. 127, lines 1-2. The trial court did not, however, grant all of the State's challenges for cause, specifically rejecting the State's challenge to venire member Vernice Warren.
> MR. BURRIS (prosecutor): State would ask for a challenge for cause.
> MS. FOX (defense counsel): I don't think there has been any predicate laid, I mean, any sufficient evidence that she can't judge.
> THE COURT: I am going to deny that motion.

Petitioner complains that his constitutional rights were violated when he was not "given the opportunity to rehabilitate this particular venire member" prior to the court's ruling.[33] In support of his argument, petitioner cites only state law.

As noted earlier, an alleged violation of state law is generally insufficient for purposes of attaining federal habeas corpus relief.[34] Further, any constitutional violation arising as a result of a trial court's alleged error in granting or not granting a challenge for cause, "must focus on the jurors who sat on the jury, not jurors who were removed...." *Wood v. Dretke*, 2004 WL 1243169, \*23 (N.D. Tex. 2004). *See also Ross v. Oklahoma,* 487 U.S. 81, 86, 108 S.Ct. 2273, 2277, 101 L.Ed.2d 80 (1988) ("Any claim that the jury was not impartial ... must focus not on Huling [the excused venire member], but on the jurors who ultimately sat [on the jury].")

Petitioner further states that his constitutional rights were violated when, after he "vociferously objected" to the voir dire proceedings, he was not allowed to ask venire members "pertinent questions" such as: "[W]hether they themselves were grandparents; whether their grandparents were still living or deceased; [and] whether

_____

*See* State rec., vol. 1 of 3, p. 127, lines 16-23.

[33]*See* Federal rec., doc. 1, petitioner's supporting memorandum at p. 26.

[34]*See supra* at p. 8.

22

there were many elderly members in their immediate community".[35] Because he was not allowed to ask these questions, petitioner complains that the majority of the jurors selected "were either elderly members themselves, or ha[d] elderly members in their families". According to petitioner, such a jury composition was prejudicial in light of the fact that the crime at issue involved an attack on an elderly man by a much younger man.[36]

An obvious problem with the above argument is that if one seeks to eliminate from the list of eligible jurors both "elderly" persons and persons with "elderly" family members, one would be hard-pressed to find a sufficient number of venire members to comprise a jury. Additionally, review of the trial transcript reflects that while petitioner did ultimately raise before the trial court a "vociferous" objection, said objection was not lodged until after voir dire had been completed and the six-member jury plus one alternate had been chosen and sworn in by the court.[37] As evidenced by the following colloquy, while the voir dire proceeding was taking place, at approximately the halfway point, petitioner refused to participate.

> MS. FOX:
>
> Before we do that, I'm sorry, Your Honor. I would like to put on the record that I asked Mr. Washington for his assistance in selecting jurors from this particular panel and Mr. Washington informed me that he wanted

---

[35]*See* Federal rec., doc. 1, petitioner's supporting memorandum at p. 27.

[36]*See* Federal rec., doc. 1, petitioner's supporting memorandum at p. 27-28.

[37]*See* State rec., vol. 1 of 3, p. 176, lines 20-32; pp. 177-180; p. 181, lines 1-19.

me off his case, that he didn't want any of these people. When I tried to explain to him that we only had six challenges left, he insisted that he wanted none of them and he wanted a new lawyer, at which time, Your Honor, I gave up trying to seek his input.[38]

Based upon the above, along with the fact that trial courts are afforded wide discretion with respect to voir dire questioning, *see Daniels v. Burke*, 83 F.3d 760, 766 (6th Cir.), *cert. denied*, 519 U.S. 942, 117 S.Ct. 327, 136 L.Ed.2d 241 (1996), *citing Mu'Min v. Virginia*, 500 U.S. 415, 424, 111 S.Ct. 1899, 1904, 114 L.Ed.2d 493 (1991), the court concludes that petitioner's argument is without merit and he is not entitled to habeas corpus relief.

### D. Improper Exclusion of Jurors

Petitioner's argument regarding the alleged improper exclusion of jurors appears to be two-fold. Initially he complains that his constitutional rights were violated by virtue of the fact that the trial court allowed the State to strike black jurors on the basis of race. Such action is clearly prohibited under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), wherein the Supreme Court established the analysis to be utilized in evaluating claims of purposeful racial discrimination in the jury selection process. First, the defendant must make a prima facie showing that the prosecutor improperly challenged prospective jurors on the basis of race. *Batson*, 476 U.S. at 96-97,

---

[38]*See* State rec., vol. 1 of 3, p. 172, lines 1-11.

106 S.Ct. at 1723.  Proof of a prima facie case is necessarily fact-intensive and is determined by examining a number of factors with recognition "that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." *Id*.

In the instant matter, petitioner has clearly failed to make the requisite prima facie case.  As the state trial court noted in its rejection of the instant claim, petitioner fails to "specify which prospective jurors who were excluded were black nor does he allege any specific impropriety."[39]  The State, in its response, makes a similar observation, stating: "[T]he record does not reflect the races of the prospective jurors...."[40]

In addition to his *Batson* argument, petitioner also appears to be arguing that his right, under the Sixth and Fourteenth Amendments, to a jury selected from a fair

---

[39]A copy of the state district court's March 6, 2003 unpublished opinion denying petitioner's post-conviction application is attached to petitioner's federal habeas corpus application as Exhibit "B".

[40]*See* Federal rec., doc. 6, State's response at p. 8.  In its response the State also suggests that petitioner's *Batson* claim is procedurally barred due to his failure raise his *Batson* objection at trial. However, petitioner's failure to timely raise his *Batson* objection at trial, as required under state procedural law, cannot be used to procedurally bar his corresponding federal habeas claim based upon the fact that the state courts did not rely upon petitioner's failure to raise a contemporaneous objection as a basis for denying, on post-conviction, his *Batson* claim.  *See generally Johnson v. Puckett,* 176 F.3d 809, 823 (5th Cir. 1999) (A federal habeas claim may be procedurally barred only when the state has based its rejection of the claim on an independent and adequate state procedural ground.)

cross-section of the community was violated.  Petitioner sets forth the test, enunciated in

*Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), utilized for the

purpose of determining whether or not such a violation has occurred.  Specifically, under

*Duren*, 439 U.S. at 364, 99 S.Ct. at 668, in order to make the necessary prima facie case

that the State violated "the fair-cross-section requirement", petitioner must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the
> community; (2) that the representation of this group in venires from which
> juries are selected is not fair and reasonable in relation to the number of
> such persons in the community; and (3) that this underrepresentation is due
> to systematic exclusion of the group in the jury-selection process.

Petitioner, however, has failed to submit any specifics for the purpose of satisfying his

burden of proof.

Finally, petitioner suggests that his constitutional rights were violated when

the trial court, in response to the objection he lodged to "the selecting procedures and

seating of this particular jury," ordered that he be removed from the courtroom.[41]  A

review of the pertinent transcript reflects that shortly after the jury members had been

chosen, petitioner stated:  "Objection, Your Honor."[42]  Thereafter, following the jury's

departure from the courtroom, the following exchange took place.

---

[41]*See* Federal rec., doc. 1, petitioner's supporting memorandum at p. 24.

[42]*See* State rec., vol. 1 of 3, p. 177, lines 1-2.

THE COURT:

I'm going to tell you for the last time. Listen to me. You know I had to talk to you during the last trial. You know what happens with outbursts. I either bind you and gag you or put you outside this courtroom while your trial goes on. Now the choice is yours.

MR. MICHAEL WASHINGTON:

As long as you violating my rights –

THE COURT:

You're not listening to me. You better listen to me because I'm telling you what is going to happen. You're going to be bound and gagged and you're going to be sitting here in this courtroom where you can't talk or you're going t be in another room. The choice is yours. Now be quiet.

MR. MICHAEL WASHINGTON:

Cause –

THE COURT:

Get him out of here. I'm tired of listening to him.

MR. MICHAEL WASHINGTON:

I'm going to file something to have you dismissed off my case too.

THE COURT:

You do it.

MR. MICHAEL WASHINGTON:

You ain't going to violate my rights.

THE COURT:

No, sir, I'm not going to violate your rights

(AT THIS TIME, A RECESS WAS TAKEN.)[43]

Following the recess, when court had resumed but before the jury was brought back into the courtroom, the trial judge provided a final warning to petitioner.

---

[43]*See* State rec., vol. 1 of 3, p. 178, lines 17-32; p. 179, lines 1-17.

THE COURT:

Now, let's get one other thing clear before we get started, too. When we tried this case the last time, we had an outburst from you during the trial of the case. I want you to know it's not going to be tolerated. One more and you're out of here. You have the right to be present in this courtroom, you have the right to confront your accusers, but you also have the obligation to conduct yourself like a gentleman and to sit there and be quiet without making outbursts, and I only have two options when you don't do what you should do, and that is either to bind you and gag you or to remove you from the courtroom. I don't want to do that to you. I want you to sit here and act like a responsible human being, listen to the testimony, let your attorney listen to the witnesses so she can cross-examine them. So understand this, one outburst and you're gone.[44]

The fact that a defendant, during the course of his trial, is, as a result of his disruptive behavior, removed from the courtroom, does not, *ipso facto*, mean that he has suffered a violation of his constitutional rights. The Supreme Court clearly dispelled such a notion in *Illinois v. Allen*, 397 U.S. 337, 343, 90 S.Ct. 1057, 1060-1061, 25 L.Ed.2d 353 (1970), wherein the Court stated:

[W]e explicitly hold today that a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.

In the instant case, petitioner's removal from the courtroom took place prior to the actual commencement of trial and outside the presence of the jurors. Immediately

---

[44]*See* State rec., vol. 1 of 3, p. 180, lines 8-26.

following petitioner's disruptive objection, the trial court did not admonish him. Instead, he waited until the jury had been excused, then warned that future outbursts would result in petitioner being bound and gagged or removed from the courtroom. The trial court's action in this regard was clearly not unconstitutional.

### E. Ineffective Assistance of Counsel

The seminal Supreme Court decision regarding ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984), wherein the Court held that in order to prove that counsel was ineffective, petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.

Under the deficient performance prong of the *Strickland* test, "it is necessary to 'judge...counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed. 2d 180 (1993), *citing Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. To prove prejudice under the *Strickland* standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

Petitioner complains that his counsel was ineffective due to her failure to file a discovery motion to obtain the victim's medical records from Riverside Medical Center, Charity Hospital, and Delaron Hospital. Petitioner claims that these records should have been made available to the jury since they would have provided evidence refuting the State's theory that the beating which the victim suffered at the hands of petitioner contributed to and/or hastened his death.

A review of the pertinent transcript reflects that the victim's Charity Hospital records were made available to the jury, having been introduced into evidence as State Exhibit 15 and 15-A.[45] Similarly, the victim's records from Delaron Hospital were admitted into evidence as State Exhibit 10[46] and his records from Riverside Medical Center were admitted into evidence as State Exhibit 14.[47] Said records, however, rather than refuting the State's theory, supported it. It was based, in part, upon their review of said records that the medical experts opined that the beating which the victim suffered at the hands of petitioner contributed to and/or hastened his later death.

Petitioner next complains that his counsel was ineffective due to her failure to discover and introduce into evidence the victim's arrest and conviction record.

---

[45]*See* State rec., vol. 1 of 3, p. 220, lines 28-32.

[46]*See* State rec., vol. 2 of 3, p. 288, lines 30-32.

[47]*See* State rec., vol. 1 of 3, p. 206, line 32; p. 207, lines 1-7.

Petitioner contends that he was prejudiced by counsel's failure in this regard because if the prosecutor had been aware of the victim's arrest and conviction record, he may have allowed petitioner to plead guilty to the lesser charge of negligent homicide. As shown below, petitioner's argument is without merit.

Negligent homicide is defined under LSA-R.S. 14:32A as "the killing of a human being by **criminal negligence** [emphasis added]." The unrefuted eyewitness testimony makes clear that negligence, criminal or otherwise, played no role in petitioner's beating of the victim. Debbie Crumedy testified that she saw petitioner knocked the victim to the ground and repeatedly punch him in the face with his fist, then stomp on him with his foot.[48] Two other eyewitnesses, Charlotte and Tony Prewitt, likewise testified that petitioner punched the victim in the face, estimating that he punched the victim 10 to 15 times.[49]

Petitioner asserts that his counsel was also ineffective due to her failure to object to the qualifications of Dr. Rodney Huddelston and Dr. Lee Domangue as medical experts. Petitioner contends that he was prejudiced as a result of this deficiency on the part of counsel because the "erroneous medical opinions" of these "so-called experts"

---

[48]*See* State rec., vol. 1 of 3, p. 230, lines 23-32; p. 231, lines 1-13.

[49]*See* State rec., vol. 1 of 3, p. 237, lines 7-14; p. 245, lines 31-32; p. 246, lines 1-11.

"misled" the jury to conclude that "petitioner caused the victim's death."[50]  For the following reasons, petitioner's argument is without merit.

First, a review of Dr. Huddelston's testimony reflects that he never opined that the victim's death was caused by the beating he suffered at the hands of petitioner. Instead, Dr. Huddelston admitted that he never examined the victim prior to his death and that his representation on the death certificate that the victim died from natural causes was nothing more than guesswork on his part.[51]  As for Dr. Domangue, while petitioner may disagree with Dr. Domangue's expert opinion to the effect that the beating the victim suffered at the hands of petitioner contributed to his death, petitioner provides no basis upon which defense counsel could reasonably have challenged Dr. Domangue's medical expertise.  The trial transcript reflects that at the time he offered his expert testimony at trial, Dr. Domangue had been a licensed physician for almost 20 years, had been board certified in the field of emergency medicine for over ten years, and had been qualified as an expert witness in several courts including the court before which he was presently appearing.[52]  The law is clear that an attorney is under no obligation to raise an objection or argument when the chance of success is unlikely.  *See United States v. Kimler*, 167

---

[50]*See* Federal rec., doc. 1, petitioner's memorandum at p. 12.

[51]*See* State rec., vol. 2 of 3, p. 281, lines 20-32; p. 282, lines 1-9.

[52]*See* State rec., vol. 2 of 3, p.287, lines 30-32; p. 288, lines 1-8.

F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument . . .

cannot form the basis of a successful ineffective assistance of counsel claim because the

result of the proceeding would not have been different had the attorney raised the issue.");

*Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995) ("Counsel cannot be deficient for

failing to press a frivolous point."); *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994)

("Failure to raise meritless objections is not ineffective lawyering; it is the very

opposite.").

Another alleged deficiency on the part of counsel was her failure to motion

the trial court for funds for the purpose of hiring an expert witness. Petitioner asserts that

counsel, in order to refute the prosecution's theory that his beating of the victim hastened

the victim's death, should have called, as an expert witness, a physician to offer testimony

regarding all of the diseases/ailments, such as "heart disease, stroke, cancer and

Alzheimer's disease", to which older persons are susceptible.[53]  However, a review of the

trial transcript reflects that the jury was, in fact, made aware of the 64-year old victim's

frailties.  Specifically, the jury was informed that the victim, at the time of his death, was

suffering from "blastomycosis", a condition described as a "body-wide infection, a

---

[53]*See* Federal rec., doc. 1, petitioner's supporting memorandum at pp. 8-9.

fungus". Further, the jury was informed that the victim had suffered "several small strokes".[54]

Additionally, the jury was well aware of the fact that the direct cause of the victim's death at Delaron Hospital on January 28, 1994, was cardiopulmonary arrest. The emergency room physician, Dr. Domangue, testified:

> A. Shortly after his [the victim's] arrival [at Delaron's emergency room], his level of consciousness, his respiratory rate, and his pulse rate decreased, and we needed ultimately to get a central venose line established and to intubate him, that is put a tube into his trachea and to assist his ventilation.
>
> Q. After that procedure was done, what happened next?
>
> A. Shortly thereafter his heart rate stopped. He needed advance cardiac life support which was provided for about twenty minutes, and around, I would say, 13:30, which is 1:30 p.m., he was pronounced dead. Specifically at 13:43.[55]

The failure to call a particular witness to offer testimony at trial is not *per se* prejudicial to the point of warranting habeas relief. *See generally Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978) ("complaints of uncalled witnesses are not favored, [in federal habeas review] because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative"). In *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985), the

---

[54]*See supra* at p. 19.

[55]*See* State rec., vol. 2 of 3, p. 289, lines 18-27.

Fifth Circuit noted that for a petitioner to show prejudice under *Strickland*, he must show that the testimony of the witnesses would have been favorable and that the witnesses would have testified at trial. Petitioner must show a reasonable probability that the uncalled witnesses would have made a difference in the result. *Alexander*, 775 F.2d at 603. There is a strong presumption that the failure of petitioner's counsel to call witnesses is a strategic choice. *Strickland*, 466 U.S. at 689-90, 104 S.Ct. at 2065-66.

In the instant case, one can surmise that defense counsel did make a strategic decision not to call any additional medical experts since, as set forth above, the victim's frailties were made known to the jury. The expert testimony desired by petitioner, a general discussion regarding common ailments suffered by older persons was not needed since evidence that the victim, in fact, was suffering from such frailties was brought before the jury.

Petitioner also complains that counsel should have petitioned the court for funds in order to have an autopsy performed on the victim. However, as Dr. Tracy explained at trial, the "chances of getting useful information" from an autopsy performed on an exhumed body "some days after the actual death and burial," "would be pretty slim."[56] Thus, again, petitioner has failed to show the requisite prejudice resulting from counsel's alleged deficiency.

---

[56]*See* State rec., vol. 1 of 3, p. 210, lines 11-14.

Finally, petitioner asserts that defense counsel was ineffective due to her failure to object to the selection process by which the jury was chosen and her failure to "object and preserve these assignments of error for direct appeal."[57]  However, as discussed above, petitioner suffered no violation of his constitutional right in connection with the jury selection process nor do any of petitioner's assignments of error constitute valid claims warranting relief.  As such, petitioner was not prejudiced by counsel's alleged deficiency in failing to object to the trial court's voir dire and failing to preserve the pertinent assignments of error.

### F.  Conflict of Interest

When a timely objection is raised with regard to an attorney's alleged conflict of interest, a trial court generally has a constitutional obligation to investigate the matter in order to ascertain whether or not counsel's representation should continue.  *See Holloway v. Arkansas*, 435 U.S. 475, 484, 98 S.Ct. 1173, 1178-1179, 55 L.Ed.2d 426 (1978); *see also Cuyler v. Sullivan*, 446 U.S.335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Petitioner contends that contrary to the above constitutional mandate, when he raised an objection to defense counsel's continued representation, rather than considering the matter, the trial judge shouted that he "was tired of listening" to petitioner and ordered

---

[57]*See* Federal rec., doc. 1, petitioner's supporting memorandum at pp. 5-6.

36

that petitioner be "removed" from the courtroom.[58] For the following reasons, the court finds that petitioner did not suffer a violation of his constitutional rights and therefore, is not entitled to federal habeas corpus relief.

A conflict of interest, triggering the constitutional safeguards set forth in *Holloway* and *Cuyler, supra,* generally arises in a situation where defense counsel represents multiple defendants.[59] In the instant matter, no such situation existed. Instead, the alleged "conflict" was nothing more than a disagreement between petitioner and counsel regarding the benefit of filing a motion for the production of the victim's medical reports and a motion for the allocation of funds for the purpose of hiring a medical expert and having an autopsy performed.

Assuming, *arguendo*, that petitioner had been entitled to the constitutional protection contemplated by the Supreme Court in *Holloway* and *Cuyler, supra*, a review of the trial transcript reflects that contrary to petitioner's suggestion, the trial court did not

---

[58]*See* Federal rec., doc. 1, petitioner's supporting memorandum at p. 17. The specific trial colloquy to which petitioner refers is set forth *supra* at p. 27.

[59]For example, in *U.S. v. Salado*, 339 F.3d 285, 291-92 (5th Cir. 2003), a conflict of interest was found to exist where defense counsel's presentation of an argument would significantly benefit one defendant, but severely damage a second defendant whom counsel was also representing. A variation of this general situation arose in *U.S. v. Morris*, 259 F.3d 894, 899 (7th Cir. 2001), wherein a conflict of interest was found to exist when counsel's interest in avoiding a malpractice suit conflicted with his duty to effectively represent the defendant in connection with a motion to withdraw a guilty plea on the ground that false information was provided by counsel.

ignore his objection to defense counsel's representation, but rather, allowed petitioner to provide the basis for his objection.

> MR. MICHAEL WASHINGTON:
>
> The thing is this here. I don't feel in my heart that I'm getting a fair jury trial this time because the reason why for that is because I can see now that all the evidence is not presented back that was in my first trial and I had asked for motions to be filed in my behalf after the mistrial and I never did get them filed in my behalf because I wanted doctors' reports and my doctors to be in my behalf, professional doctors, as what the DA asked for and I asked for funds for the autopsy to be [run] on the victim, Mr. Crosby, to determine what really was the cause of the man's death and I asked for these things but I'm not getting them.[60]

Accordingly;

## RECOMMENDATION

It is hereby **RECOMMENDED** that the application for federal habeas corpus relief filed on behalf of petitioner, Michael Washington, be **DENIED WITH PREJUDICE**. A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served

---

[60]*See* State rec., vol. 1 of 3, p. 181, lines 5-19.

with notice that such consequences will result from a failure to object. *Douglass v.*

*United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this ___26 TH___ day of ___January___, 2006.


LOUIS MOORE, JR.
United States Magistrate Judge